## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

DONALD R. PEVIA,                          *

Plaintiff                                 *

v                                         *         Civil Action No. ELH-14-2928

BOBBY P. SHEARIN, et al.                  *

Defendants                                *
                                        ***

## MEMORANDUM

Self-represented plaintiff Donald R. Pevia, a Maryland prisoner incarcerated at North Branch Correctional Institution ("NBCI"), has filed a § 1983 suit against former Warden Bobby Shearin and former Chief of Security Keith Arnold, alleging that he was denied due process while NBCI was placed on lockdown from August 2013 to March 2014, and he was forced to participate in a "levels program." ECF 1.   Shearin has filed a motion to dismiss or, in the alternative, for summary judgment. ECF 15.[1]   It is supported by a legal memorandum (ECF 15-1) (collectively, "Motion"), as well as numerous exhibits.  Plaintiff opposes the motion.  ECF 17, "Opposition."[2]  He has also submitted several exhibits.

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6.   For the reasons that follow, Shearin's Motion, construed as a motion for summary judgment, shall be granted.

---

[1] Arnold was not served with the suit, and the Motion was not filed on his behalf.  For the reasons that follow, even if Arnold had been properly served with the Complaint, he would be entitled to dismissal.

[2] ECF 17 is a "Motion for Summary Judgment," but I have construed it as an opposition to defendant's Motion as well as a summary judgment motion.   To the extent it is a motion for summary judgment, it is denied.

# I.      Factual Background

Plaintiff alleges that from May to August of 2013, a number of brutal assaults occurred within NBCI, many of which were committed by gang members and occurred with the assistance or acquiescence of correctional staff.  ECF 1 at 3.[3]  Ultimately, in August 2013, a correctional officer was repeatedly stabbed by an inmate.  ECF 1 at 3.  In response, former Warden Shearin "placed the prison on security emergency lock down."  *Id.* at 4.  According to Pevia, between August and October 2013, NBCI went through changes in procedures, which adversely impacted inmates' recreation, jobs, and housing.  *Id.*[4]  According to plaintiff, in November of 2013, Shearin implemented "an arbitrary level system . . . ."  *Id.*

Pevia was directed to supplement his Complaint.  ECF 3.  In his supplemental submission (ECF 4), plaintiff alleges that his placement in Housing Unit ("H.U.") 2 on Level 2 of the system constituted an atypical and significant hardship.  ECF  4 at 1.  Pevia states that while he was housed on H.U. 2 he was only permitted to take one shower a week and was provided only one hour of out-of-cell recreation per week.  *Id.* at 1.  In contrast, plaintiff states that inmates housed in H.U. 4 were permitted one hour of recreation daily, as well as daily showers.  *Id.*

Additionally, plaintiff states that the windows in H.U. 2 were bolted shut as an additional means of punishment. *Id.* at 2.  In contrast, he notes that windows in other housing units were not bolted shut.  Plaintiff claims that with the heater on and windows closed, the temperature in his cell would reach 100 degrees.  He states that he slept on the floor next to the door for relief.  *Id.*

---

[3] All references are to the document and page numbers as assigned by the court's electronic docketing system.

[4] To the extent plaintiff raises claims about the experience of other inmates in regard to the restrictive measures, such claims are not properly before the court.

Plaintiff also notes that, prior to being placed on Level 2, he was attending school in pursuit of his high school diploma and earning 10 days of diminution of confinement credits monthly.  *Id.* at 2.  He complains that he was "forcefully removed from school" for "no reason," and asserts that his placement on Level 2 barred him from those opportunities. *Id.*

Further, plaintiff asserts that because he was locked in his cell for all but one hour a week, he "suffered a severe weight gain" and diabetes.  ECF 4 at 2.  Pevia also complains that his visitation was adversely impacted by his placement on Level 2.  He states that he refused his family's request to visit on several occasions because the visits would have had to occur in a "phone booth sized room" that had a three inch glass separating him from his family. ECF 4 at 2. In addition, Pevia states that during visits he would have to remain handcuffed, with a chain around his waist, and a black box at his wrists.  *Id.*  Plaintiff states that he refused to let his young children see him so constrained. *Id.*

William Bohrer became Chief of Security for NBCI in September 2013.  ECF 15-2, Bohrer Decl., ¶ 2.[5]  In his Declaration, Bohrer avers that on August 5, 2013, NBCI was placed on emergency institutional lockdown in response to the "unprovoked" stabbing of a correctional officer multiple times by an inmate housed in general population.  *Id.* ¶ 4.  He also asserts that since January 2013 "there had been many [other] incidents of assaults on staff in the months preceding the lockdown" (*id.*), including a severe head beating of a dietary officer on July 5, 2013, and many assaults on inmates by fellow inmates.  *Id.*

Richard Roderick, Acting Assistant Warden and Correctional Case Manager, also submitted a Declaration.  *See* ECF 15-3.  He, too, asserts that NBCI was placed on lockdown on

---

[5] Bohrer succeeded Arnold as Chief of Security.  Bohrer has worked for the Maryland Department of Public Safety and Correctional Services since 1996.

August 5, 2013, because "inmates committed numerous assaults against both staff and inmates."
*Id.* ¶ 5.

The lockdown was implemented to ensure the safety and security of the institution.  ECF
15-2, ¶ 5.  According to Roderick, during the initial phase of the lockdown, staff were required to
perform many extra duties, without the assistance of inmate workers, in order  to keep the
institution operational. ECF 15-3**,** ¶ 6**.**

As a result of the lockdown, on August 13, 2013, NBCI implemented a shower schedule.
ECF 15-2, ¶ 6. Showers were offered during the 7-3 shift and 3-11 shift. Two inmates, while
handcuffed, were permitted out of their cells at a time. According to the action plan implemented
by Warden Shearin, the goal of the new shower schedule was for each inmate to receive a
weekly shower and out-of-cell recreation.  Inmates confined in H.U. 2 received one shower per
week from August 13, 2013, until November 4, 2013. Thereafter, they were provided showers
twice a week. *Id.*  Out-of-cell recreation was also limited during the lockdown.

Out-of-cell activity resumed during the 7-3 and 3-11 shifts on September 9, 2013.  ECF
15-2, ¶ 9.  But, when recreation was cancelled due to inclement weather it was not rescheduled.
*Id.*  The resumption of out-of-cell activities was "balanced" against the institutional need to
address "safety concerns" and to assure that resumption of activities "would not pose" a "danger
to staff or inmates."  ECF 15-2, ¶ 9; *see also* ECF 15-2, ¶ 11; ECF 15-3, ¶ 12.  Resumption of
out-of-cell activities was also delayed because the institution had to install additional safety
features, such as fence dividers and slots on the recreation room doors and portal slots. ECF 15-
2*,* ¶ 9.

By October 22, 2013, the institution had increased activities.  This included out-of-cell
activities, showers, medical/dental passes, the serving of one hot meal per day during the week,

use of the telephone inside the recreation room, visitation during weekends in restraints in the visitor booth, access to the housing unit library, access to LASI requests, legal video conferences, Inmate Grievance Office ("IGO") hearings, parole hearings, and a limited resumption of inmate work assignments. ECF 15-2, ¶ 10. By March 28, 2014, meals, showers, and out-of-cell activities were "basically back to Pre-Lockdown status." ECF 17-1 at 27 (email from Randy Durst, NBCI IGO Coordinator to Scott Oakley, Executive Director of IGO). And, programming was "coming up slowly." *Id.*

In conjunction with the lockdown, Shearin developed a "Levels system" to screen inmates and classify them for institutional jobs. ECF 15-3, ¶ 7. While awaiting approval of "the levels manual" from Division of Correction ("DOC"). Ultimately, however, the substantive elements of the Levels system were not implemented at NBCI because DOC approval was not received. *Id.* ¶ 8. "In anticipation of the approval of the Levels system, inmates were evaluated and assigned to housing units." *Id.* Shearin directed that the entire inmate population be assessed by an "interdisciplinary committee" with various roles and tasks at NBCI. ECF 15-2, ¶ 7. A case management classification team was created to evaluate each inmate and determine his suitability for general population housing or for transfer out of NBCI. ECF 15-3, ¶9. The team was composed of staff from case management, custody, social work, and psychology. ECF 15-2, ¶ 7. Additionally, inmates participated in the review process. *Id.*

As part of the process, an interview was conducted to assess each inmate's behavior, attitude, and cooperation "in order to properly plan for future operations and safety of the institution . . . ." ECF 15-2, ¶ 8. Evaluation of each inmate also included security assessments, review of disciplinary history, and comments from the housing unit officers and staff. ECF 15-3,

¶ 9.  The classification team made recommendations that were then forwarded to the Assistant Warden and Warden for final approval. ECF 15-2, ¶7; ECF 15-3, ¶ 10.

By October 22, 2013, the institution began assigning inmates "to specific housing unit wings."  ECF 15-2, ¶ 10.  The objective was "to accelerate" the resumption of normal activities and to "assign approved inmates to work assignments."  *Id.*

There is some discrepancy as to the unit in which plaintiff was housed at the relevant time.  It appears from the records that in September 2013 plaintiff was housed on H.U. 1 in administrative segregation, and was moved to H.U. 2 on November 5, 2013.  *See* ECF 17-1 at 19; ECF 15-4 at 11.  According to the defense, plaintiff remained assigned to general population throughout the lockdown.  ECF 15-3, ¶ 11.  But, Roderick and Bohrer aver that plaintiff was assigned to H.U. 2 and was not moved as a result of the lockdown or case management review. ECF 15-2, ¶ 8; ECF 15-3, ¶ 10.  Roderick indicates that H.U. 2 is a "mixed unit housing" containing "Special Needs" inmates as well as general population inmates. ECF 15-3, ¶ 11.

The housing discrepancy is not material, however, because the lockdown applied to all inmates.  Indeed, during the lockdown, all inmates in all housing units, whether on segregation or in general population, were subject to the limitations put in place by the Warden.  ECF 15-3, ¶ 13.

According to the defense, plaintiff was interviewed by the classification review team on October 22, 2013, in conjunction with his housing.  ECF 15-2, ¶ 8; ECF 15-3, ¶ 10.  Pevia disputes the nature of his participation in the classification interview.  He indicates that he was forced to attend a meeting where he was advised that, based on discussion with plaintiff's tier officers, who described plaintiff as calm, he was being moved from H.U. 1 to H.U.2, but he could not be moved to H.U. 3 or H.U. 4 because he had previous rule infractions, including an

6

assault.  ECF 17 at 4-5.  Pevia was advised that he would need to work his way out of H.U. 2 into H.U. 3 and H.U. 4.  *Id.* at 5.

Plaintiff states that during this time he only spoke with Correctional Officer Wilt; he did not speak to any of the other people from case management in the room.  *Id*.  He maintains that no case manager interviewed him, and he was "classified under fals[e] pretences [sic]."  *Id*. Plaintiff objected to being placed on a lockdown unit when he had already served his segregation term for the assault.  Additionally, he was concerned about completing his G.E.D. course.

As noted, Bohrer claims that out-of-cell activity resumed on September 9, 2013.  ECF 15-2, ¶ 9.  But, Pevia maintains that in November of 2013, he was only permitted 15 minutes of out-of-cell activity on Saturdays.  ECF 17 at 2. He claims that this gradually increased to one hour of out-of-cell activity per week and one shower per week.  *Id*.  In addition, plaintiff asserts that inmates who had been assigned to dietary or sanitation inside Level 2 were terminated from their duties and inmates housed in H.U. 3 & H.U. 4, the "honor buildings," were permitted to come to H.U. 2 to fulfill those job duties.  *Id*. Plaintiff also indicates that the commissary forms were different for the various "levels."  ECF 17 at 3.

Both Bohrer and Roderick explain that housing Units were brought off of lockdown and back to full resumption of activities one housing unit at a time, to insure the safety and security of staff and inmates.  ECF 15-2, ¶¶ 9 & 11; ECF 15-3, ¶ 12.  The gradual roll back of the lockdown across the housing units also allowed the various institutional departments time to reestablish services.  ECF 15-2, ¶ 11; ECF 15-3, ¶ 12. H.U.  4 was brought back to full service first and H.U.2 was brought back last.  ECF 15-3, ¶ 13.[6]  But, as indicated, during the lockdown, general population inmates housed in H.U.3 and H.U.4 "were subject to the same restrictions and

---

[6] Notably, if plaintiff was in H.U.1, and not in H.U.2, then he was not in the unit that was the last to regain privileges.

reduction in services and privileges" as those inmates housed in H.U.2.   ECF 15-3, ¶ 13.
Roderick explains that, given that the resumption of service went from one unit to another and
from full lockdown to modified lockdown to the full resumption of services, it could have
appeared that other general population units received more privileges than plaintiff's unit, but
this was not the case. *Id.*

Records reflect that plaintiff was assigned as a student on April 25, 2013, and attended
classes until they were cancelled on August 5, 2013, due to the lockdown.   ECF 15-3, ¶ 14.   At
that time, Pevia "was ready to take [his] GED exam . . . ."   ECF 15-4 at 13.   After the lockdown
ended, plaintiff was assigned to the job bank.   ECF 15-3, ¶ 14; ECF 15-4 at 12.   On December 2,
2014, a case manager referred plaintiff for educational services.   However, as of the date of the
defendant's dipositive motion a placement had not been made.   ECF 15-3, ¶ 14; ECF 15-4 at 13.

Plaintiff indicates that, "[o]nce the level system was implemented by defendants, each
Housing unit was provided specific recreational periods and job assignments, and other program
privalidges [sic], such as school.   Housing Unit #1 being the lowest level."   ECF 17 at 2.
Plaintiff states that once he was placed on Level 2, he was removed from school and placed in
"job bank sanitation."   *Id.*   On February 28, 2014, plaintiff received a notice from his case
manager that the school was full.   He was directed to write to the education department if he
wanted to be added to the waiting list.   ECF 17 at 12.   The Education Department subsequently
advised plaintiff that it could not add names to the school waiting list; only case management
could do so. Plaintiff was further advised that the education department had not been provided
any information as to when H.U. 2 would be released for school.   *Id.* at 13.

In regard to plaintiff's complaint that his windows were bolted shut, a memorandum from
former Chief of Security Frank B. Bishop, Jr., dated April 1, 2009, outlines the policy regarding

exterior cell windows.  ECF 15-4 at 14.  Cell windows were to be closed on approximately November 1 and reopened on approximately April 1.  The windows were closed for "cost savings/energy waste due to the climate during the colder months in this region."  *Id*.  The memo indicates that if an inmate believes he has a medical issue he may submit a sick call request in order to be evaluated.  *Id*.  There is no evidence that plaintiff sought a medical order that he be permitted to open his exterior cell window due to a medical condition.

According to Scott Oakley, Executive Director of the Inmate Grievance Office ("IGO"), plaintiff filed ten grievances since November 1, 2013.  ECF 15-5, Oakley Decl., at 2 ¶2.  Among others, he filed a grievance with IGO on March 17, 2014, complaining that his due process rights were violated by his involuntary placement in a "'levels program'" at NBCI.  ECF 15-5, Oakley Decl., ¶ 2c.  The grievance was dismissed on May 22, 2014, due to plaintiff's failure to state a claim upon which administrative relief could be granted. Plaintiff did not seek judicial review. *Id*.

On April 9, 2014, plaintiff filed another grievance with the IGO, complaining that he had been subject to double jeopardy by being confined in a housing unit based on his past inmate rule violations.  ECF 15-5, ¶ 2d.  This grievance was administratively dismissed on May 22, 2014, for failure to properly exhaust administrative remedies and for failure to state a claim upon which administrative relief could be granted. There is no indication plaintiff sought judicial review of that decision. *Id*.

Plaintiff has provided exhibits regarding his multiple efforts to pursue and exhaust administrative remedies.  ECF 17 at 14-15; ECF 17-1 at 1-10; 23-25.  In fact, on May 20, 2014, another inmate's ARP appeal concerning the new Levels program and classification review "was found meritorious in part in that the level system previously implemented at NBCI had not been

approved." ECF 17-1 at 25. As a result, on June 8, 2014, Warden Bishop removed all Levels-related materials from NBCI and implemented a Max 1 and Max 2 security status system. *Id*. at 26.

## II.    Standard of Review

Defendant's motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. ECF 15. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U. S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). When the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).[7]

---

[7] In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.).  This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary.  *Id.* at 165-67.

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours v. Kolon Indus., Inc.*, 637 F.3d 435; 448-49 (4th Cir. 2011). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)).  To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).   "Rather, to justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'"  *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted).

summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials.").

A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

If a non-moving party believes that further discovery is necessary before consideration of summary judgment, the party who fails to file a Rule 56(d) affidavit does so at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods,* 302 F.3d at 244 (citations omitted). But, the non-moving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature. Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id.* (internal citations omitted). According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Id.* at 244-45 (internal citations omitted).

Plaintiff has not filed an affidavit under Rule 56(d) or otherwise requested discovery. Nevertheless, I am satisfied that it is appropriate to address the defendant's motion as one for summary judgment, because it will facilitate resolution of this case.

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). However, the court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002); *see FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Moreover, the trial court may not make credibility determinations on summary judgment. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black &. Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45. Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not

appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility.

Nevertheless, to defeat summary judgment, conflicting evidence, if any, must give rise to a *genuine* dispute of material fact. *See Anderson*, 477 U.S. at 247-48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id.* at 248; *see Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Id.* at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corporation v. Catrett*, 477 U.S. 317, 323–24 (1986)).

## III.   Discussion

### A.  Failure to Exhaust Administrative Remedies

Defendant raises the affirmative defense of non-exhaustion and assert that the claims that have not been properly presented through the administrative remedy procedure must be dismissed pursuant to 42 U.S.C. §1997e.

The Prisoner Litigation Reform Act provides, in pertinent part:

(a) Applicability of administrative remedies

14

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. §1997e.

For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h). The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

Notably, administrative exhaustion under § 1997e(a) is not a jurisdictional requirement and does not impose a heightened pleading requirement on the prisoner. Rather, the failure to exhaust administrative remedies is an affirmative defense to be pleaded and proven by defendants. *See Jones v. Bock*, 549 U.S. 199, 215-216 (2007); *Anderson v. XYZ Correctional Health Services, Inc.*, 407 F.2d 674, 682 (4th Cir. 2005).

The PLRA's exhaustion requirement serves several purposes.  These include "allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." *Jones*, 549 U.S. at 219; *see Moore*, 517 F. 3d at 725 (exhaustion means providing prison officials with the opportunity to respond to a complaint through proper use of administrative remedies).  It is designed so that prisoners pursue administrative grievances until they receive a final denial of the claims, appealing through all available stages in the administrative process.  *Chase v. Peay*, 286

F.Supp.2d 523, 530 (D. Md. 2003), *aff'd* 98 Fed. Appx. 253 (4th Cir,. 2004); *Gibbs v. Bureau of Prisons*, 986 F.Supp. 941, 943-44 (D. Md. 1997) (dismissing a federal prisoner's lawsuit for failure to exhaust, where plaintiff did not appeal his administrative claim through all four stages of the BOP's grievance process); *see also Booth v. Churner*, 532 U.S. 731, 735 (2001) (affirming dismissal of prisoner's claim for failure to exhaust where he "never sought intermediate or full administrative review after prison authority denied relief"); *Thomas v. Woolum*, 337 F.3d 720, 726 (6th Cir. 2003) (noting that a prisoner must appeal administrative rulings "to the highest possible administrative level"); *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) (prisoner must follow all administrative steps to meet the exhaustion requirement, but need not seek judicial review).

Ordinarily, an inmate must follow the required procedural steps in order to exhaust his administrative remedies. *Moore v. Bennette,* 517 F.3d 717, 725, 729 (4th Cir. 2008); *see Langford v. Couch,* 50 F.Supp.2d 544, 548 (E.D. Va. 1999) ("[T]he PLRA amendment made clear that exhaustion is now mandatory.").  But, this court is "obligated to ensure that any defects in administrative exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006). The Fourth Circuit has addressed the meaning of "available" remedies in *Moore,* 517 F. 3d at 725:

> [A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it. *See Aquilar-Avellaveda v. Terrell*, 478 F. 3d 1223, 1225 (10th Cir. 2007); *Kaba v. Stepp*, 458 F. 3d 678, 684 (7th Cir. 2006). Conversely, a prisoner does not exhaust all available remedies simply by failing to follow the required steps so that remedies that once were available to him no longer are. *See Woodford v. Ngo*, 548 U.S. 81, 89 (2006). Rather, to be entitled to bring suit in federal court, a prisoner must have utilized all available remedies "in accordance with the applicable procedural rules," so that prison officials have been given an opportunity to address the claims administratively. *Id*. at 87. Having done that, a prisoner has

> exhausted his available remedies, even if prison employees do not respond. *See*
> *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006).

*See also Blake v. Ross*, 987 F.3d 693, 698-701 (4th Cir. 2015).

The Maryland Department of Public Safety and Correctional Services ("DPSCS") has made an "administrative remedy procedure" ("ARP") available to Maryland State prisoners, within the meaning of 42 U.S.C. § 1997e(a), for the submission of "grievance[s] against . . . official[s] or employee[s] of the Division of Correction." Md. Code, Correctional Services Article ("C.S.") § 10-206(a); *see generally* C.S. §§ 10-201 *et seq*.; Code of Maryland Regulations ("COMAR") 12.07.01.01(B)(1) (defining ARP). Regulations promulgated by DPSCS concerning the administrative remedy procedure define a "grievance' to include a "complaint of any individual in the custody of the [DOC] . . . against any officials or employees of the [DOC] . . . arising from the circumstances of custody or confinement." COMAR 12.07.01.01B(8).[8] An inmate "must exhaust" the ARP process as a condition precedent to further review of the inmate's grievance. *See* C.S. § 10-206(b); *see also* COMAR

---

[8] Maryland appellate case law indicates that the administrative grievance procedure does not encompass "'every kind of civil matter that could be brought by a DOC inmate.'" *Massey v. Galley*, 392 Md. 634, 646, 898 A.2d 951, 958 (2006) (citation omitted). Rather, it applies only to matters that "relate to or involve a prisoner's 'conditions of confinement.'" *Id.* at 651, 898 A.2d at 960 (citation omitted). Thus, the grievance procedure does not apply to requests for public information under the Maryland Public Information Act, *see id.*, nor does it apply to medical malpractice claims against private medical service providers who treat inmates under contract with the DOC. *See Abramson v. Correctional Med. Servs., Inc.*, 359 Md. 238, 753 A.2d 501 (2000).

Moreover, the administrative grievance procedure does not apply to claims for compensation for disabilities resulting from "personal injury arising out of and in the course of [an inmate's] work for which wages or a stipulated sum of money was paid by a correctional facility," C.S. § 10-304, for which a claim to a different administrative body, the Sundry Claims Board, is the exclusive remedy. *See Dixon v. DPSCS*, 175 Md. App. 384, 927 A.2d 445 (2007). On the other hand, the grievance process does apply to a wide variety of claims that arise out of the conditions of confinement, even if the grievance process cannot provide a comprehensive remedy for such claims, such as tort claims of assault and battery against prison officers. *See McCullough v. Wittner*, 314 Md. 602, 552 A.2d 881 (1989).

12.07.01.02.D; DCD 185-002 (effective August 27, 2008).  Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines." *Woodford v. Ngo*, 548 U.S. 81, 88, 93 (2006).

In Maryland, filing a request for administrative remedy with the warden of the prison is the first of three steps in the ARP process. *See* COMAR 12.07.01.04. The ARP request must be filed within 30 days of the date on which the incident occurred, or within 30 days of the date the inmate first gained knowledge of the incident or injury giving rise to the complaint, whichever is later. COMAR 12.07.01.05A.  If the request is denied, a prisoner has 30 calendar days to file an appeal with the Commissioner of Correction. COMAR 12.07.01.05C; *Blake v. Ross*, 787 F.3d at 697.  If the appeal is denied, the prisoner has 30 days to file a grievance with the Inmate Grievance Office. *See* C.S. §§ 10-206, 10-210; COMAR 12 07.01.03; COMAR 12.07.01.05B.

Complaints are reviewed preliminarily by the IGO.  *See* C.S. § 10-207; COMAR 12.07.01.06A. If the complaint is determined to be "wholly lacking in merit on its face," the IGO may dismiss it without a hearing. C.S. § 10-207(b)(1); *see* COMAR 12.07.01.07B. The order of dismissal constitutes the final decision of the Secretary of DPSCS for purposes of judicial review. C.S. § 10-207(b)(2)(ii). However, if a hearing is deemed necessary by the IGO, the hearing is conducted by an administrative law judge with the Maryland Office of Administrative Hearings. *See* C.J. § 10-208(c); COMAR 12.07.01.07-.08. The conduct of such hearings is governed by statute. C.S. § 10-208.

A decision of the administrative law judge denying all relief to the inmate is considered a final agency determination. However, a decision concluding that the inmate's complaint is wholly or partly meritorious constitutes a recommendation to the Secretary of DPSCS, who must

make a final agency determination within fifteen days after receipt of the proposed decision of the administrative law judge. *See* C.S. § 10-209(b)-(c).

The final agency determination is subject to judicial review in Maryland State court, so long as the claimant has exhausted his/her remedies. *See* C.S. § 10-210. But, an inmate need not seek judicial review in State court in order to satisfy the PLRA's administrative exhaustion requirement. *See*, *e.g.*, *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir.) ("[A] prisoner who uses all administrative options that the state offers need not also pursue judicial review in state court."), *cert. denied*, 537 U.S. 949 (2002).[9]

Plaintiff indicates that he exhausted his "available" remedies. He clearly filed a series of ARPs regarding what he perceived to be issues as to the Levels system implemented at NBCI. His ARPs were denied at the prison level and plaintiff noted timely appeals to the IGO, which were also denied. Moreover, ultimately, the same claim was raised by another inmate and was ultimately found meritorious in part, as the Warden had not been granted approval to implement a Levels program, and all references to the same at NBCI were removed by Warden Bishop. ECF 17-1 at 25-26. Therefore, I decline to dismiss for failure to exhaust administrative remedies.[10]

## B. Due Process

Plaintiff asserts that his claims arise under the Due Process Clause of the Fourteenth

---

[9] But *see* Md. Code, Cts. & Jud. Proc. Art. § 5-1003(a)(3) of Courts and Judicial Proceedings Article ("Judicial review following administrative consideration shall be the exclusive judicial remedy for any grievance or complaint within the scope of the administrative process . . . .").

[10] In *Blankumsee v. DOC*, PWG-13-2507, Judge Grimm issued a Memorandum on July 22, 2014 (ECF 37), in which he reached the merits of the prisoner's claims after concluding that "the administrative remedy procedure was unavailable to him during the time proscribed by the regulations," because of the lockdown at NBCI. *Id.* at 8.

Amendment, not the Eighth Amendment's prohibition against cruel and unusual punishment. ECF 17 at 2.  The Fourteenth Amendment's Due Process Clause guarantees that no state shall "deprive any person of ... liberty ... without due process of law."  To bring a due process claim, a plaintiff must first show the existence of a protected property or liberty interest. *Mathews v Eldridge*, 424 U.S. 319, 332 (1976); *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). A plaintiff may bring a civil action to redress due process violations under 42 U.S.C. § 1983.

In the prison context there are two different types of constitutionally protected liberty interests that may be created by government action. The first is created when there is a state created entitlement to an early release from incarceration. *Board of Pardons v. Allen*, 482 U.S. 369, 381 (1987) (state created liberty interest in parole); *Wolff v. McDonnell*, 418 U.S. 539, 557 (1974) (state created liberty interest in good conduct credits). The second type of liberty interest is created by the imposition of an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995); *see Wilkinson v. Austin*, 545 U.S. 209 (2005).

As the Fourth Circuit recently noted, "[t]he Supreme Court has long recognized that a prisoner may have a state-created liberty interest in certain prison confinement conditions…." *Prieto v. Clarke*, 780 F.3d 245, 248 (4th Cir. 2015).   Whether confinement conditions are atypical and substantially harsh "in relation to the ordinary incidents of prison life" is a "necessarily . . . fact specific" comparative exercise. *Beverati v. Smith*, 120 F.3d 500, 502, 503 (4th Cir. 1997); *accord Ramirez v. Galaza*, 334 F.3d 850, 861 (9th Cir. 2003) ("There is no single standard for determining whether a prison hardship is atypical and significant, and the condition or combination of conditions or factors . . . requires case by case, fact by fact consideration.") (alteration in original) (internal quotation marks omitted).

*Wilkinson*, 545 U.S. 209, involved transfer to and housing in the isolated confinement of a "supermax" facility. *Id.* at 213.  It also involved solitary confinement-- isolated human contact for potentially "indefinite" periods. *Id.* at 224.  The Court recognized that the severe deprivations detailed in that case exist in most solitary confinement facilities, and looked at the presence of added factors to find "an atypical and significant hardship" on inmates such that they had a liberty interest in avoiding it. *Id.* at 224.   These factors were (1) the potentially indefinite length of detention, limited only by the length of the underlying sentence, and (2) being rendered ineligible for parole due to confinement.   *Id.*   The Supreme Court said:  "While any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context." *Id.*  Therefore, such prisoners have a protected liberty interest in avoiding placement in such confinement. *Id.*

Recently, the Fourth Circuit explained:  "*Wilkinson* does not hold that harsh or atypical prison conditions in and of themselves provide the basis of a liberty interest giving rise to Due Process protection." *Prieto*, 780 F.3d at 250.  Rather, there must exist an interest in avoiding "erroneous placement [in the challenged confinement] under the state's classification regulations *combined with* . . . harsh and atypical conditions" for Due Process protections to apply. *Id.* (emphasis in original) (citing *Wilkinson*, 545 U.S. at 224-25).

"[T]he general population is the baseline for atypicality for inmates who are sentenced to confinement in the general prison population and have been transferred to security detention while serving their sentence." *Incumaa v. Stirling*, 791 F.3d 517, 527 (4th Cir. 2015).  Where conditions in segregated confinement are "similar in most respects to those experienced by inmates in the general population," no liberty interest exists in avoiding that segregation assignment. *Bevarati v. Smith*, 120 F.3d 500, 503 (4th Cir. 1997).  But, for an inmate sentenced

to death and on death row, as in *Prieto*, 780 F.3d 245, "using the general population to gauge the ordinary incidents of prison life . . . was improper." *Incumaa*, 791 F.3d at 528 (citing *Prieto*, 780 F.3d at 252-54). Although the nature of a prisoner's conviction and the length of his sentence do not give rise to differing liberty interests, "'state law mandates [regarding] the confinement conditions to be imposed on offenders convicted of a certain crime and receiving a certain sentence . . . are, by definition, the ordinary incidents of prison life for such offenders.'" *Id.* (quoting *Prieto*, 780 F.3d at 254) (alterations in *Incumaa*).

As a prisoner, plaintiff is not entitled to the process due to persons who remain at liberty. "Prisoners held in lawful confinement have their liberty curtailed by definition, so the procedural protections to which they are entitled are more limited than in cases where the right at stake is the right to be free from confinement at all." *Wilkinson*, 545 U.S. at 225.

Roderick avers that the substantive elements of a Level system were not implemented at NBCI because they had not been approved by DOC headquarters. ECF 15, Ex. 2. But, even if a Levels program was improperly implemented, the conditions experienced by plaintiff within that system were not atypical and resulted in no due process violation.

Pevia was not subjected to conditions of confinement different from those of general population inmates. In fact, plaintiff was assigned to general population and, before and after the lockdown, he was in a housing unit that contained general population inmates and "special housing" inmates. Additionally, the restrictions of the lockdown applied to all inmates, regardless of their classification to general population or segregation. Although other housing units were returned to full privileges prior to plaintiff's unit, there is nothing in the record to indicate that the limits placed upon plaintiff, including limited out-of-cell activity and conditions on visitation, were atypical as to the conditions placed on the rest of the inmate population.

In addition, the only differences identified by plaintiff between his housing experience and that of inmates in H.U. 3 & 4 are his delayed ability to be reassigned to education, the difference in the commissary, and the bolting of the exterior cell windows.  It appears that only the limitation on commissary was put in place as Shearin attempted to implement a Levels system.  Defendant indicates that a return of services, including resumption of educational services, occurred over time, in part to allow the various departments to come back on line with full services while insuring the safety of the institution.  Expertise of prison officials in matters of security must be given its due deference.  *See Sandin*, 515 U.S. at 482.  Further, defendant explains that the windows in H.U. 2 were bolted shut in the winter as a cost saving measure, implemented years before Warden Shearin endeavored to institute a Levels program. Plaintiff's allegations fail to suggest circumstances so different from those in the general prison population that they are atypical in comparison.

Moreover, there is no constitutional right for an inmate prisoner to be housed in a particular institution, at a particular custody level, or in a particular portion or unit of a correctional institution, nor does a prisoner have a right to participate in a particular program. *See Sandin*, 515 U.S. at 484 (concluding that protected liberty interests are generally limited to freedom from restraint which imposes atypical and significant hardship on inmate in relation to ordinary incidents of prison life); *McKune v. Lile*, 536 U.S. 24, 26 (2002) (stating the "decision where to house inmates is at the core of prison administrators' expertise"); *Meachum v. Fano*, 427 U.S. 215, 225 (1976) (holding that the Constitution's Due Process Clause does not "protect a duly convicted prisoner against transfer from one institution to another within the state prison system"); *see also Olim v. Wakinekona*, 461 U.S. 238, 244-45 (1983); *Rizzo v. Dawson*, 778 F. 2d 527, 530 (9th Cir. 1985).

"[G]iven a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution." *Meachum*, 427 U.S. at 224.   Analyzing each of plaintiff's allegations regarding the restrictive conditions placed upon him while NBCI was on lockdown, his claim fails.   There is no freestanding constitutional right to commissary privileges. *See Madison v. Parker*, 104 F. 3d 765, 768 (5th Cir. 1997).  Moreover, prisoners do not have a constitutional right to access educational or rehabilitative programs, or to demand to be housed in one prison rather than another, absent a showing of significant hardship not evident here.  *See Moody v. Daggett*, 429 U.S. 78, 88 n. 9 (1976); *Bulger v. United States Bureau of Prisons*, 65 F.3d 48, 49 (5th Cir. 1995) ("Prisoner classification and eligibility for rehabilitation programs ... are not directly subject to 'due process' protections") (citing *Moody*); *Bowring v. Godwin*, 551 F.2d 44, 48 n. 2 (4th Cir. 1977).

To show a civil rights violation with respect to a prison job assignment plaintiff would have to show that the actions taken against him impacted on the exercise of a constitutionally protected right. Prisoners, however, do not have a constitutionally protected right to work while incarcerated, or to remain in a particular job once assigned. *See Altizer v. Paderick*, 569 F. 2d 812, 815 (4th Cir. 1978); *Awalt v. Whalen*, 809 F. Supp. 414, 416-17 (E.D. Va. 1992).  And, lack of opportunity to earn or have applied diminution credits is not an atypical and significant hardship that implicates a liberty interest.  *See Meachum*, 427 U.S. at 225–26; *see also Wolff* , 418 U.S. at 557; *Bulger*, 65 F.3d at 50.

In *Sandin v. Conner*, *supra*, 515 U.S. 472, the Supreme Court explained:

States may under certain circumstances create liberty interests which are protected by the Due Process Clause. But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force,

nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

*Id.* at 483-84 (citations omitted).

Matters of security classification are reserved to the sole discretion of prison officials. *See Slezak v. Evatt*, 21 F.3d 590, 594 (4th Cir. 1994).  In analyzing conditions of confinement, the court must consider a correctional system's need to maintain order, discipline, and control. *See Sandin*, 515 U.S. at 483-84 (stating that "federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment"); *see also Wolff*, 418 U.S. at 558–62.

In sum, this court is unaware of any Maryland law or regulation conferring a protected liberty interest on DOC inmates that has been abridged here. Absent a protected liberty interest, a plaintiff cannot successfully claim that his due process rights were violated, because "[p]rocess is not an end in itself." *Olim v. Wakinekona*, 461 U.S. at 250.  Reviewing plaintiff's allegations in the light most favorable to him, there are no genuine issues of disputed material fact and defendant is entitled to summary judgment in his favor as a matter of law.[11]

### C.  Eighth Amendment Claim

Although plaintiff indicates in his Opposition that he is not advancing an Eighth Amendment claim regarding his conditions of confinement, were he to do so the claim would fail.  The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment.  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).  "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S.294, 297 (1991)).

---

[11] Thus, this court need not reach defendant's defense of qualified immunity.

An inmate may state an Eighth Amendment claim based on the conditions under which he is confined.  "Indeed, the Eighth Amendment "imposes duties on [prison] officials, who must provide humane conditions of confinement."  *Makdessi v. Fields,* 289 F.3d 126, 132 (4th Cir. 2015) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)).  Inmates may state an Eighth Amendment claim as to the conditions under which they are confined.

Conditions that "deprive inmates of the minimal civilized measure of life's necessities" may amount to cruel and unusual punishment.  *Rhodes v. Chapman*, 452 U. S. 337, 347 (1981).  However, conditions that are merely restrictive or even harsh "are part of the penalty that criminal offenders pay for their offenses against society."  *Id*.  As the *Farmer* Court said, 511 U.S. at 832, "[t]he Constitution does not mandate comfortable prisons. . . ."

To establish a claim for cruel and unusual punishment due to conditions of confinement**,** a plaintiff must show (1) an objectively serious deprivation of a basic human need causing serious physical or emotional injury, and (2) that prison officials were deliberately indifferent to that need. *Farmer,* 511 U.S. at 834; *Wilson v. Seiter,* 501 U.S. 294, 298 (1991).  The Fourth Circuit has said:

> In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements - that "the deprivation of [a] basic human need was *objectively* 'sufficiently serious,' and that '*subjectively* the officials act[ed] with a sufficiently culpable state of mind.'"

*Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (emphasis in original; citation omitted). "These requirements spring from the text of the amendment itself; absent intentionality, a condition imposed on an inmate cannot properly be called "punishment," and absent severity, such punishment cannot be called "cruel and unusual." *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008) (citing *Wilson*, 501 U.S. at 298-300).

To meet the first prong, a plaintiff must allege facts to show that the condition complained of caused a "sufficiently serious" deprivation of a basic human need. *Farmer,* 511 U.S. at 834. "Only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement." *De'Lonta v. Angelone*, *supra*, 330 F.3d at 634.  And, the plaintiff has the burden of alleging facts sufficient to show that the risk from the conditions of his confinement was so grave that it violated contemporary notions of decency and resulted in significant physical or emotional injury. *See Hudson v. McMillian,* 503 U.S. 1, 8 (1992).

A plaintiff cannot have been found to be subjected to unconstitutional confinement conditions unless he can show a serious or significant physical or mental injury as a result of those conditions. *Strickler v. Waters,* 989 F.2d 1375, 1379–81 (4th Cir. 1993) (stating that the inmate's legal complaint about overcrowding and poor ventilation did not constitute a constitutional violation because inmate did not allege that he suffered any specific injury as a result of those purported conditions).  Therefore, "to withstand summary judgment on an Eighth Amendment challenge to prison conditions a plaintiff must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions." *Strickler*, 989 F.2d 1375, 1381 (4th Cir.1993); *see Odom v. South Carolina Dept. of Corrections*, 349 F. 3d 765, 770 (4th Cir. 2003).

To meet the second prong, *i.e.*, a "sufficiently culpable state of mind," *Wilson*, 501 U.S. at 298, a plaintiff must allege facts sufficient to show that the defendant knew of circumstances from which an inference could be drawn that a "substantial risk of serious harm" was posed to plaintiff's health and safety, that he drew that inference, and disregarded the risk posed. *Farmer,* 511 U.S. at 837; *Wilson*, 501 U.S. at 298.  In other words, "'the test is whether the guards know

the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they fail to do so.'" *Brown v. North Carolina Dept. of Corrections,* 612 F.3d 720, 723 (4th Cir. 2010) (quoting *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir. 2002)).

The key in determining whether prison conditions become cruel and unusual requires examination of the effect on the inmate.   *See Rhodes v. Chapman*, 452 U.S. at 364.   Such deprivations may be demonstrated by producing evidence of a serious or significant physical injury resulting from the challenged conditions, *Strickler*, 989 F. 2d at 1380-81; *Rish v. Johnson*, 131 F.3d 1092, 1096 (4th Cir. 1997), or by demonstrating a substantial risk of serious harm resulting from the unwilling exposure to the challenged conditions.  *See Helling v. McKinney*, 509 U.S. 25, 33-35 (1993) (exposure to environmental tobacco smoke).

In *Brice v. Virginia Beach Corr. Ctr.*, 58 F. 3d 101, 105 (4th Cir. 1995), the Court said that "deliberate indifference in this context lies somewhere between negligence and purpose or knowledge: namely, recklessness of the subjective type used in criminal law."   However, "a prison official cannot hide behind an excuse that he was unaware of a risk, no matter how obvious." *Id.*  And, "even a subjective standard may be proven with circumstantial evidence[.]" *Makdessi,* 789 F.3d at 133.

A defendant's actions are not actionable unless, "in light of preexisting law the unlawfulness of those actions is apparent."  *Iko v. Shreve*, 535 F. 3d 225, 238 (4th Cir. 2008) citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  "We do not require of such officials the legal knowledge culled by the collective hindsight of skilled lawyers and learned judges, but instead only the legal knowledge of an objectively reasonable official in similar circumstances at the time of the challenged conduct." *Johnson v. Caudill*, 475 F. 3d 645, 650 (4th Cir. 2007).

Plaintiff's claim regarding conditions of confinement is centered around the long-term lockdown of NBCI following several inmate-on-guard assaults.  Plaintiff bolsters his claim that the lockdown and the resulting conditions of confinement were unconstitutional with evidence that Warden Shearin was fired because of his decision to lock down the prison on a long-term basis.  ECF 17-1 at 11.  He includes a news release listing the reasons Shearin was terminated, which included failure to hold staff accountable for actions that created an unsafe work environment, failure to communicate with the inmate population which created an atmosphere of distrust, violation of policy, failure to follow orders and directives, and failure to address serious staff misconduct.  *Id*. To the extent Shearin's termination establishes the NBCI lockdown was a bad decision and that the prison was not being efficiently or well managed, it does not serve to establish that the conditions of confinement violated plaintiff's Eighth Amendment rights.

The conditions as described by plaintiff were not so severe that defendant could be charged with "fair warning that their conduct was unconstitutional."  *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F. 3d 2929, 313 (4th Cir. 2006).   The temporary loss of privileges such as visitation, phone use, commissary, and recreation are not so egregious as to shock the conscience.  The practice of allowing inmates only one shower per week during a brief period of time also does not approach the level of deprivation contemplated by the Eighth Amendment's prohibition of cruel and unusual punishment. This conclusion is supported by the absence of proof of any significant, serious physical or psychological injury resulting from the conditions described.  Defendant is entitled to judgment in his favor.

## CONCLUSION

For the foregoing reasons this court will DISMISS defendant Arnold as a party to this action. Defendant Shearin's dispositive motion, treated as a motion for summary judgment, will

be GRANTED and judgment will be ENTERED in favor of Shearin and against plaintiff.

An Order follows.

December 22, 2015
Date

_____/s/_____
Ellen L. Hollander
United States District Judge